UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION

UNITED STATES OF AMERICA,            CRIM. CASE NO. 04-50074

                    Plaintiff,
v.                                   HONORABLE PAUL V. GADOLA
                                     UNITED STATES DISTRICT JUDGE
RAYMOND RALPH McMICHAEL,

                    Defendant.
_____/

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO QUASH THE SEARCH WARRANT**

Before the Court is a motion brought by Defendant to quash the search warrant. The Court held an evidentiary hearing on this motion on March 18, 2005, which was continued to March 25, 2005. The parties provided supplemental briefing on April 8, 2005. For the reasons stated below, the Court determines that Defendant does not have standing to bring the motion, but even if Defendant did have standing, the motion would be denied because the initial entry into the McGuire house was permissible as a protective sweep and because the search warrant affidavit was supported by probable cause.

**I.   BACKGROUND**

An indictment was filed against Defendant Raymond Ralph McMichael on December 1, 2004. The original indictment contained two counts against Defendant McMichael, one count for conspiracy to manufacture and distribute marijuana in violation of 21 U.S.C. §

841(a)(1), 841(b)(1)(A)(vii), and 846, and a second count for being a felon in possession of firearms. The second count has been omitted from the subsequent superseding indictments due to the effect of a presidential pardon.

The affidavit in support of the search warrant states the following facts. On November 20, 2004, an experienced DEA Agent communicated with a confidential informant whom he has known for "over a dozen years," and who "has never provided any false information to law enforcement officers while [the informant] was cooperating." Aff. at ¶ 1, 4. The informant stated that on November 18, 2004, the informant was taken to 6200 McGuire Road in Fenton, Michigan by "John." Id. at ¶ 5. "John" attempted to enlist the informant in "a large scale hydro marijuana-growing enterprise." Id. The informant reported that the facilities at 6200 McGuire Road had been in operation for over one year. Id. The affidavit describes the house, other structures on the property, the setup of the operation within the house, and the value of the type of marijuana. Id.

The informant also reported that "John" drove the informant by 5750 Mabley Hill Road, in Fenton, Michigan. Id. at 7. The informant was told by "John" that the leader of the organization lived at this address. Id. The agent's research indicated that Raymond McMichael, Defendant, lived at this address and had been

arrested in 1979 for trafficking in marijuana, although the disposition of that arrest was unknown at the time of the affidavit. Id.

On November 22, 2004, the informant told the agent that the informant had communicated with "John" again and learned that the operation was still at the 6200 McGuire Road house. Id. at ¶ 8. Another agent drove by the house and saw unclaimed newspapers at the curb, which the affiant claimed was consistent with a house not being used as a residence. Id. at ¶ 9. The affidavit also stated that the power usage at the house was 114% greater than that month the previous year, and a significant portion of that was for natural gas. Id. at ¶ 10. The affidavit states that natural gas generators are often used for electrical power. Id.

On November 22, 2004, the informant told the agent that the operation was about to be moved, because it had been in operation for long enough at that location. Id. at ¶ 11. Another agent drove by the house and observed a trailer backed up to the garage and at least two other trucks nearby. The observing agent considered this to be consistent with the removal of the operation. Id.

Based on that information, the agent decided to seek a search warrant. Id. While the search warrant was being prepared, but before it was submitted, the vehicle with the trailer and the two

other trucks left the residence. Id. at ¶ 12. Assistant United States Attorney Mark Jones directed the stop of the vehicles down the street. Id. at ¶ 12. The vehicles were then taken back to the residence. Id. The officers then entered the house to check for weapons or other individuals destroying evidence. Id. at ¶ 13. Evidence of a large scale grow operation was apparent to the officers during the protective sweep. Id.

The affidavit requested a warrant permitting the search of the two residences, three vehicles, and a trailer for drugs, firearms, records, and other drug paraphernalia. Id. at ¶ 16-19. Magistrate Judge Capel signed the search warrant on November 23, 2004. Defendant now contests the initial entry into the McGuire house and whether the warrant was supported by probable cause.

## II. ANALYSIS

### A. Defendant's Capacity to Object to the Search

The first issue for the Court to address is standing, that is whether Defendant has the capacity to object to the search. A defendant seeking to challenge the search or seizure of a vehicle or other piece of property pursuant to the Fourth Amendment must first establish that he has standing to challenge the search or seizure. See United States v. Richards, 147 F. Supp. 2d 786, 788 n.1 (E.D. Mich. 2001) (Gadola, J.), aff'd, 56 Fed. Appx. 667 (6th Cir. 2003). Specifically, Defendant has the burden of showing that

(1) he manifested a subjective expectation of privacy in the object of the challenged search and (2) society is prepared to recognize that expectation as legitimate. See id.

Regarding the search of 5750 Mabley Hill Road, this is Defendant's home. Defendant has a subjective expectation of privacy that society is prepared to recognize in his home. Defendant therefore has the capacity to contest the search at this address. The Court similarly finds that Defendant has the capacity to contest the search of his own truck and trailer. Gov't Ex. 2(b), 3(c); Aug. 25, 2005 Tr. at 21-23.

Defendant also asserts the capacity to contest the search at 6200 McGuire Road ("the McGuire house"), the location of the marijuana grow operation. To determine his capacity, the Court will first review Defendant's interest in the McGuire house, which was developed at the second day of the evidentiary hearing. Defendant had an arrangement with co-defendant Chad Morea ("Morea") regarding the purchase of and operations at the McGuire house. Morea testified at the evidentiary hearing regarding the financial arrangement. Specifically, Defendant McMichael provided Morea with approximately $25,000.00 to $30,000.00 over several months, which Morea in turn provided to a third-party for a down payment on the McGuire house. Mar. 29, 2005 Tr. at 22. The third party obtained the mortgage and then entered into a land contract with Morea.

Gov't Ex. 12. Defendant McMichael and Morea then each paid half of the land contract payments, that is, each paid approximately $900.00 for the $1,822.00 monthly payment. Id. at 25, 42. Defendant McMichael and Morea would also split bills for utilities and equipment. Id. at 34. Morea repaid Defendant McMichael approximately $100,000.00 for the house and equipment that Defendant McMichael had advanced to him. Id. at 24, 62. The arrangement was that the house would belong to Morea after the operation was complete. Id. at 34. Defendant McMichael sought to keep his name off the contract documents, perhaps because of a previous arrest and the risk associated with the house. Id. at 34-35.

The Court notes that the McGuire house, although appearing to be a home on the outside, was not used as a residence. Id. at 27-28. It was "hot and muggy," had no furniture, no clothing, no personal hygiene products or personal effects, and was not used for storage of vehicles or personal items. Id. Occasionally drinks and sandwiches would be kept there. Id. Regarding the exterior of the house, there was a gate at the end of the driveway that opened with a remote control. Id. at 28. There was also a separate remote control for the garage door. Id.

Even though Defendant disassociated himself from the home by keeping his name off the contracts, he was allegedly involved in

the operations and regularly visited the house. See, e.g., id. at 32. He allegedly had openers for the gate and the garage, was free to come and go from the house, and had a financial interest (albeit without documentation) in the house and the operation. Based on the subjective understanding of Defendant and Morea, and the privacy expected through the gate and garage, the Court determines that Defendant has manifested a subjective expectation of privacy in the house.

The Court must next assess whether this expectation of privacy is a legitimate and reasonable one that society is prepared to recognize. Defendant's name is absent from the land contract, and there is no document in evidence indicating his ownership in the property. Gov't Ex. 12. Even assuming Defendant did have an ownership interest, the Sixth Circuit has held that "ownership alone does not justify a reasonable expectation of privacy." Shamaeizadeh v. Cunigan, 338 F.3d 535, 544 (6th Cir. 2003) (citing United States v. Salvucci, 448 U.S. 83, 91 (1980)). The Sixth Circuit has suggested other factors besides ownership to consider in making this determination, including "whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately

on the premises." <u>United States v. King</u>, 227 F.3d 732, 744 (6th Cir. 2000).

Initially, it might seem that the gates and the outward appearance of the residence constitute precautions to maintain privacy. The Court, however, is not required to stop its analysis at the outward appearance of the house in determining the issue of capacity to challenge a search. <u>See</u>, <u>e.g.</u>, <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998) (addressing the nature of the visit inside to determine capacity to challenge search). Rather, the Court must address whether Defendant had a "reasonable expectation of privacy that was invaded." <u>United States v. Padilla</u>, 508 U.S. 77, 82 (1993).

The United States Supreme Court addressed a similar situation in <u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998), in which individuals bagging cocaine in an apartment residence challenged the search. The Supreme Court determined that the <u>Carter</u> defendants lacked the capacity to challenge the search, because the defendants "were essentially present for a business transaction." <u>Carter</u>, 525 U.S. at 90. Although the Supreme Court in <u>Carter</u> did note "the relatively short period of time [defendants spent] on the premises," the temporal duration is relevant to establishing an expectation of privacy and is not determinative by itself. <u>Id.</u> at 91. In this case, even though Defendant McMichael spent a

substantial amount of time on the premises, he had no personal effects in the residence, unlike an overnight guest or resident. Additionally, unlike Carter, the McGuire house was not used as a residence by anyone; there was no furniture, no personal effects, and the humidity and conditions of the house were not suitable for habitation. Furthermore, Defendant took steps to distance himself from the property by ensuring that his name was not on documentation associated with the residence. Morea also repaid Defendant's interest in the house and the house would have belonged to Morea after the completion of the operation. Finally, the entire purpose of the house as presented to the Court was for an illegal marijuana growing operation; there was no legitimate residence.

Given these facts, the Court determines that Defendant does not have a reasonable expectation of privacy in the McGuire house that society is prepared to recognize: the house was "simply a place to do business," and, notably, an entirely illegal business. Carter, 525 U.S. at 90. Even unlike a personal office, the house was devoid of Defendant's personal effects, or any personal effects at all. Defendant cannot simultaneously retain a reasonable expectation of privacy, while avoiding the consequences of connections to the house by keeping his name off any documentation. The Court therefore finds that Defendant does not have the capacity

9

to object to the search of this residence.

**B.   The Initial Entry into the McGuire House**

Even if the Court were to assume for the sake of argument that Defendant has the capacity to contest the search of the McGuire house, the Court would still determine that Defendant's motion should be denied. The Court will address the propriety of the search on the merits as an alternative holding. Defendant's supplemental brief argues that the initial entry into the McGuire house, which occurred prior to the obtaining of a search warrant, was an illegal search. The Government characterizes this entry as a protective sweep. The Supreme Court has held "that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 334 (1990).

In this case the arrest occurred on a road about six-tenths of a mile from the McGuire house while the house was under surveillance. Apr. 18, 2005 Tr. at 90. Three vehicles were stopped down the road after leaving the McGuire house. Id. at 74. Large water tanks were observable in the beds of two pickup trucks and an officer could smell marijuana while approaching one of the vehicles. Mar. 18, 2005 Tr. at 74, 77. The officers effectuated

the stop on the road, rather than by the house, to make the stop "as safe as possible" for the officers.  Id. at 53.  Because the stop was required suddenly in order to detain the vehicles departing from the McGuire house, the search warrant had not yet been prepared.  Id. at 80.  The officers determined that it would not be safe to leave the vehicles on the narrow dirt road until the search warrant was obtained.  Id.  For the safety of the officers and of the Defendants, the vehicles and the detained drivers were moved back to the McGuire house.  Id.

   Once back at the McGuire house, the officers were uncertain whether or not someone remained in the house.  Id. at 81.  This was because the location of the house made surveillance difficult and because no individual arrested in the vehicles was named "John," the name supplied by the confidential informant.  Id. at 81-82.  The officers were also concerned that someone would have weapons in the house or be able to construct a barricade within the house while a search warrant was prepared.  Id. at 83-84.  The officers therefore entered the house to check for individuals, as well as to prevent the destruction of evidence.  Id. at 85.

   The Court finds that the return of the vehicles to the McGuire house from less than a mile down the road was reasonable for the safety of the officers and the Defendants, since it was known that the preparation of the search warrant would take a significant

amount of time.  Having returned to the McGuire house, the officers had a legitimate concern that someone, particularly the "John" mentioned by the confidential informant, could be present in the house with weapons that could pose a danger to the officers.  The protective sweep of the house was sufficiently close to the arrest, both temporally and spatially, to warrant a protective sweep.  The Court will therefore deny Defendant's motion on this ground.

### C. Legal Standard To Quash Search Warrants

Finally, Defendant argues that the search was conducted without probable cause.  The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. Amend. IV.  "Probable cause is assessed in light of the 'totality of the circumstances.'"  United States v. Newton, 210 F. Supp. 2d 900, 903 (E.D. Mich. 2002) (Gadola, J.) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  To determine whether probable cause exists to issue a search warrant, "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Gates, 462 U.S. at 238 (quotations omitted).

"A reviewing court should not examine de novo the sufficiency of an affidavit supporting a warrant." Newton, 210 F. Supp. 2d at 903 (citing Gates, 462 U.S. at 236). Rather, "the traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Gates, 462 U.S. at 236 (quotations omitted).

Furthermore, "[t]he reviewing court should pay great deference to a magistrate's probable cause determination and should not set aside a magistrate's finding of probable cause unless it is 'arbitrary.'" Newton, 210 F. Supp. 2d at 903 (quoting United States v. Weaver, 99 F.3d 1372, 1376 (6th Cir. 1996)). "In doubtful or marginal cases, the reviewing court should uphold the magistrate's finding." Id. (citing United States v. Ventresca, 380 U.S. 102, 109 (1965)). "The rationale for this deference stems from a preference for the search warrant process over warrantless searches." Newton, 210 F. Supp. 2d at 903 (citing Ventresca, 380 U.S. at 106-07).

Even before the initial entry into the McGuire house, there was sufficient information to establish probable cause. In particular, a reliable informant gave repeated and detailed information about the growing operation. This was further

corroborated by the high utility bill, the newspapers left by the gate, and the connection to Defendant, who had a prior arrest for drug related conduct.  Finally, and most significantly, the informant stated that the operation was being moved and this was corroborated by the observation of the trailer and two trucks. Thus, even disregarding the evidence found during the entry prior to the issuance of the search warrant, probable cause existed for the issuance of the search warrant.  The Court will therefore deny the motion to quash the search warrant and to suppress evidence.

**ACCORDINGLY**, **IT IS HEREBY ORDERED** that Defendant's motion to quash the search warrant [docket entry 59] is **DENIED.**

**SO ORDERED.**


Dated: May 3, 2005                              s/Paul V. Gadola
                                                HONORABLE PAUL V. GADOLA
                                                UNITED STATES DISTRICT JUDGE


Certificate of Service

I hereby certify that on   May 3, 2005   , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:
      Mark C. Jones; Richard M. Lustig; James C. Thomas                  , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:              Robert G. Borduin                  .

                                                s/Ruth A. Brissaud
                                                Ruth A. Brissaud, Case Manager
                                                (810) 341-7845